Cherlyn **PARRISH, M.D., Appellant,**

v.

**KENTUCKY BOARD OF MEDICAL LICENSURE, Appellee.**

No. 2001–CA–001995–MR.

Court of Appeals of Kentucky.

March 5, 2004.

Rehearing Denied June 16, 2004.

Cherlyn Parrish, M.D., Washington, DC, pro se.

C. Lloyd Vest, II, Kentucky Board of Medical Licensure, Louisville, KY, for appellee.

Before COMBS, JOHNSON, and MINTON, Judges.

*OPINION*

MINTON, Judge.

Cherlyn Parrish, M.D., a radiologist, seeks review of an opinion and order of the Jefferson Circuit Court affirming an order of the Kentucky Board of Medical Licensure (Board) revoking her medical license. For the reasons set forth below, we affirm.

On March 25, 1993, Inquiry Panel A[1] of the Board filed a complaint against Parrish alleging that in her radiological treatment of Patients A through Q,[2] she engaged in dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud, or harm the public or any member thereof.[3] Specifically, the complaint alleges that Parrish committed a pattern of acts in her medical practice which, under the attendant circumstances, would be deemed to be gross incompetence, gross ignorance, gross negligence, or malpractice.[4] It also attributes to Parrish's conduct, which is calculated or has the effect of bringing the medical profession into disrepute, including, but not limited to, a departure from, or failure to conform to the standards of acceptable and prevailing medical practice within the Commonwealth of Kentucky.[5] The complaint further alleges that sufficient grounds exist for discipline to be taken against Parrish's license to practice medicine in the Commonwealth of Kentucky, pursuant to KRS 311.595(9), 311.597(3), and 311.597(4). On the same day, Inquiry Panel A also issued an order temporarily suspending Parrish's medical license, pursuant to KRS 311.592, pending resolution of the complaint.

At Parrish's request, an emergency hearing was conducted on April 12, 1993, to address the propriety of the order of temporary suspension. The primary witnesses at the hearing were Parrish and the Board's expert witness, Orson P. Smith, Jr., M.D., also a radiologist. Testimony focused on whether Parrish properly ordered and performed fluoroscopy[6] upon patients undergoing barium studies, radiological examinations of the gastrointestinal (GI) tract,[7] in accordance with acceptable and prevailing medical practice. Smith testified that fluoroscopy is important as a diagnostic tool in its own right, and it also ensures the accuracy of overhead still x-rays which follow it. He called Parrish's practice of omitting fluoroscopy in barium studies or permitting unsupervised technicians to perform it deviations from the standard of care. Parrish countered that fluoroscopy is generally unnecessary for most barium studies because overhead x-ray films are sufficient. She also claimed that she had not performed fluoroscopy in some instances because the fluoroscopy

1. The Board is divided into two six-member panels, A and B, each with the authority to serve as an inquiry panel or hearing panel. Ky.Rev.Stat. (KRS) 311.591(1). No member of an inquiry panel may serve on a hearing panel concerning the same matter. KRS 311.591(5).

2. The Board refers to the seventeen patients by letter designation to protect the privacy of the patients. However, the complaint refers to a "Patient Code List," included in the administrative record, which cross-references the letter designations with the patients' actual names.

3. KRS 311.595(9).

4. KRS 311.597(3).

5. KRS 311.597(4).

6. Fluoroscopy is a procedure in which a patient ingests barium while a radiologist observes on the screen of a fluoroscope how the barium, which is made visible by x-rays, moves in real time through the patient's GI tract. According to Smith, a radiologist also customarily takes spot still x-ray photographs (spot x-rays) during fluoroscopy of precise areas where a possible abnormality is observed or of areas which are known to be difficult to capture in an overhead x-ray film. Overhead still x-ray photographs (overhead x-rays) then follow.

7. Barium studies include both examinations of the lower GI tract, the colon, which are usually referred to as a barium enema, and examinations of the upper GI tract, the esophagus and stomach.

machine at Knox County Hospital[8] (Knox County) was defective and dangerous. Parrish offered no support for either of these claims. The hearing officer found that "[t]he performance of fluoroscopy as part of a barium study is the standard of care in the medical profession," and the failure to perform it is "gross negligence" because of the risk that a radiologist will miss a serious medical condition such as an ulcer or tumor. The hearing officer found that, in some cases, Parrish improperly skipped fluoroscopy on patients undergoing barium studies. In other cases, she permitted an unsupervised technician to perform the procedure pursuant to a standing order that she did not have to be present for fluoroscopy. Finally, in a third group, Parrish's radiological reports indicate that fluoroscopy was performed; but the absence of any supporting evidence in the patients' records, such as spot x-rays, indicates that it was **not** performed. On April 20, 1993, the hearing officer affirmed the order of temporary suspension, finding that Inquiry Panel A had shown that "sufficient probable and reasonable cause existed to believe that Dr. Parrish's practice constitutes a danger to the health, welfare and safety of her patients or the general public."

 Inquiry Panel A of the Board filed an amended complaint against Parrish on July 8, 1993, which reiterates the charges in the original complaint but only with respect to Patients R through T.[9] The amended complaint also alleges that Parrish committed the following acts: (1) engaged in a pattern of fraudulent and inflated billings; (2) generated false and misleading reports of radiological examinations; (3) forged letters of recommendation on her behalf and sent them to a hospital in Atlanta, Georgia; (4) provided false and misleading information to Knox County by submitting or soliciting a letter of recommendation from another physician without revealing that he was her husband and/or co-inhabitant;[10] and (5) willfully impeded the Board's investigation of her medical practice by providing false and misleading information to its investigator and by instructing her employees to do the same.

A lengthy hearing was conducted on December 1–3, 1994. By consent of the parties, the hearing officer was requested to also consider the evidence presented in the April 12, 1993, temporary suspension hearing. Parrish was also given the opportunity to supplement the evidence after the hearing with additional deposition testimony. The hearing officer's recommended findings of fact and conclusions of law were filed with the Board on July 11, 1994. He found substantial evidence to support all of the allegations in the complaint, ex-

8. This was one of the two hospitals where Parrish practiced radiology during the relevant time period. She also practiced at Memorial Hospital in Manchester, Kentucky.

9. Like the complaint, the amended complaint refers to a separate "Patient Code List" which lists the patients' names. The amended complaint refers only to Patients R–T and does not refer to patients A–Q who were named in the original complaint. However, it is clear from the evidence produced at all subsequent proceedings that the Board meant to include all twenty patients, A–T, in the amended complaint and that Parrish understood the amended complaint to refer to all twenty patients. Curiously, Parrish's answer to the amended complaint refers **only** to patients A–Q. Because the charges involving Patients A–Q were tried by implied consent of the parties, we shall consider them as if they had been included in the amended complaint. Ky. R. Civ. P. (CR) 15.02. This rule may be invoked even at the appellate level. *Bowling Green–Warren County Airport Bd. v. Long*, Ky., 364 S.W.2d 167, 171 (1962).

10. The record demonstrates some confusion over Parrish's marital status.

cept the claim concerning the letter of recommendation from Parrish's physician husband or co-inhabitant.[11] The hearing officer concluded that the Board had proven that sufficient grounds existed for discipline to be taken against the license of Dr. Parrish to practice medicine in the Commonwealth of Kentucky for her violations of KRS 311.595(9), 311.595(10),[12] 311.597(3), and 311.597(4). On October 20, 1994, after having heard oral arguments by both parties and having reviewed the administrative record and proposed findings of fact and conclusions of law submitted by the hearing officer, Inquiry Panel B of the Board adopted, affirmed, and incorporated the findings of fact and conclusions of law. The Board then issued an order of revocation of Parrish's medical license. This petition for review follows.

The Board is granted the authority to regulate physician licensing, including suspensions and revocations, where "the power has not been transferred by statute to some other board, commission, or agency of this state."[13] Among the possible grounds for suspension or revocation, are proof that the physician has "[e]ngaged in dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud, or harm the public or any member thereof,"[14] and proof that the physician has "[k]nowingly made, or caused to be made, or aided or abetted in the making of, a false statement in any document executed in connection with the practice of his profession."[15] KRS 311.597 sets forth a nonexclusive list of activities which are to be considered "dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud, or harm the public or any member thereof" within the meaning of KRS 311.595(9), including the following:

> (3) A serious act, or a pattern of acts committed during the course of his medical practice which, under the attendant circumstances, would be deemed to be gross incompetence, gross negligence, or

---

11. The hearing officer found that there was no evidence that Parrish knew that the purported author of the letter had not disclosed his relationship to her in the letter.

12. Following a mistake in the amended complaint, the hearing officer actually states that sufficient grounds exist to discipline Parrish under KRS 311.595(8) and 311.595(9), rather than KRS 311.595(9) and 311.595(10). This mistake is again repeated by the circuit court. KRS 311.595(8) deals with physicians who have developed mental or physical disabilities which pose a danger to their patients. No allegations were raised concerning a physical or mental illness on the part of Parrish, nor was any evidence presented on this matter. The record reveals that all parties concerned mistakenly referred to KRS 311.595(9) as 311.595(8), even going so far as to quote or paraphrase the former while citing the latter. Since the parties consistently referred to KRS 311.595(9) as 311.595(8), the only logical conclusion for what they meant by KRS 311.595(9) is 311.595(10). KRS 311.595(10) provides that proof that a physician has "[k]nowingly made, or causes to be made, or aided in the making of, a false statement in any document executed in connection with his practice of medicine" is grounds for discipline. This accurately describes the allegations that Parrish forged letters of recommendation and generated false or misleading radiology reports. Therefore, for the reasons noted *supra* at note 9 concerning trial by consent, we hold that all references in the amended complaint, recommended findings of fact and conclusions of law, and the circuit court's opinion and order to KRS 311.595(8) and 311.595(9) actually refer to KRS 311.595(9) and 311.595(10), respectively. The Court notes that even if the applicability of KRS 311.595(10) were not tried by consent, there is ample evidence to support the Board's revocation based solely on KRS 311.595(9).

13. KRS 311.595.

14. KRS 311.595(9).

15. KRS 311.595(10).

mal-practice.[16]

(4) Conduct which is calculated or has the effect of bringing the medical profession into disrepute, including, but not limited to, any departure from, or failure to conform to the standards of acceptable and prevailing medical practice within the Commonwealth of Kentucky, and any departure from, or failure to conform to the principles of medical ethics of the American Medical Association. . . . For the purpose of this subsection, actual injury to a patient need not be established.[17]

Pursuant to KRS 311.555, a reviewing court may disturb the actions of the Board only if the Board's action (1) constitutes a clear abuse of its discretion; (2) is clearly beyond its legislatively delegated authority; or (3) violated the procedures for disciplinary action as described in KRS 311.591. This statute essentially reiterates the tripartite test for arbitrariness to be applied in all cases of judicial review of an administrative agency's actions set forth in *American Beauty Homes Corp. v. Louisville and Jefferson County Planning and Zoning Commission.*[18] This tripartite test requires us to determine whether the agency exceeded its statutory powers, whether it employed proper procedures to provide adequate due process, and whether there is substantial evidence to support the agency's decision. So long as the Board's findings of fact are supported by substantial evidence, they are binding on the reviewing court, even if there is conflicting evidence in the record.[19] However, matters of statutory con-

struction are subject to *de novo* review. Because statutory interpretation is a matter of law reserved for the courts, we are not bound by the Board's interpretation.[20]

As her first ground for appeal, Parrish asserts that the Board exceeded its statutory jurisdiction by basing the revocation of her license, in part, on conduct which is beyond the scope of the Board and the Medical Practices Act. Specifically, Parrish asserts that the allegation that she forged letters of recommendation on her behalf is outside the Board's jurisdiction because this conduct is not directly related to the practice of medicine. In support, Parrish relies upon KRS 311.550, which defines the "practice of medicine or osteopathy" as "the diagnosis, treatment, or correction of any and all human conditions, ailments, diseases, or infirmities by any and all means, methods, devices, or instrumentalities." However, KRS 311.595(10) permits the revocation of a physician's license for knowingly making, causing to be made, or aiding and abetting in the making of, "a false statement in any document executed **in connection with** the practice of his profession."[21] The plain meaning of this statute encompasses a broader range of activity than simply diagnosis, treatment, and correction of illnesses. "In connection with the practice of [medicine]" is more inclusive than "in the practice of medicine." While it is possible that some types of forgery might not have sufficient ties to a physician's practice of medicine to justify discipline pursuant to KRS 311.595(10), that is not the case here. The forged documents were letters of recom-

---

16. KRS 311.597(3).

17. KRS 311.597(4).

18. Ky., 379 S.W.2d 450, 456 (1964).

19. *Urella v. Kentucky Bd. of Med. Licensure,* Ky., 939 S.W.2d 869, 873 (1997).

20. *Halls Hardwood Floor Co. v. Stapleton,* Ky. App., 16 S.W.3d 327, 330 (2000).

21. Emphasis added.

mendation on Parrish's behalf purporting to be from two fellow doctors and sent to an Atlanta hospital where she had expressed interest in working. Having the apparent purpose of furthering Parrish's opportunities to practice medicine, these forged letters are documents executed in connection with the practice of her profession. Moreover, Parrish's submitting forged letters of recommendation to a hospital constitutes dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud, or harm the public or any member thereof. These acts of forgery are grounds for discipline by the Board and not outside of its jurisdiction.

 Parrish also asserts that the claim involving her billing practices is outside the jurisdiction of the Board because it is not within the practice of medicine as defined in KRS 311.550. Indeed, Parrish asserts that the Board's attempt to regulate her billing practices is anticompetitive behavior in violation of the Sherman Antitrust Act. Parrish supports this conclusion by mischaracterizing the evidence against her. Contrary to her assertions, the Board did not arbitrarily decide that her fees were too high and thereby engage in price fixing. Instead, the Board found that she engaged in several deceptive bill-

ing practices: billing for services that were not performed at all, billing twice where only one examination was performed, habitually requiring two examinations and billing for both where only one was required, and stacking fees.[22] The Board found that these practices "deviated from the standard of care in Kentucky, are false and misleading, and bring the medical profession into disrepute," all of which are statutory grounds for discipline.

Parrish's claim regarding the Sherman Antitrust Act is meritless; preventing fraud is not anticompetitive activity. Regulating fraudulent billing practices is, however, grounds for discipline by the Board pursuant to KRS 311.595(9) and (10). Parrish's attempt to define the jurisdiction of the Board in an excessively narrow fashion is contrary to the plain meaning and legislative purpose of the Medical Practices Act.[23] The Board acted within its authority and jurisdiction in addressing claims that Parrish engaged in a practice of fraudulent billing.

 Finally, Parrish asserts that the Board has no jurisdiction to address the claim that she refused to cooperate with the Board's investigation[24] because this is a Class A misdemeanor offense pursuant

---

**22.** This finding was based on the way Parrish structured the fees for a common type of examination which requires multiple x-rays. Parrish set a fee for this examination and then charged separately for a single x-ray, which is necessarily included as part of the examination, in effect, charging twice for one portion of the examination.

**23.** Other jurisdictions have declined to apply an extremely narrow definition of the practice of medicine in similar situations. *See, e.g., Wassermann v. Board of Regents,* 11 N.Y.2d 173, 176–78, 182 N.E.2d 264, 265–66, 227 N.Y.S.2d 649, 650–52 (1962) (upholding discipline of physician for misconduct in the practice of medicine while performing clerical tasks such as paying third party payors), and

*Catena v. Pennsylvania,* 49 Pa. Cmwlth. 542, 545–46, 411 A.2d 869, 870–71 (1980) (upholding suspension of physician's license for fraudulent Medicare claims in the practice of medicine.)

**24.** The Board found that Parrish instructed her billing clerk to lie and tell him that Parrish's medical records were unavailable. The Board also found that Parrish refused to answer any questions or provide any contact information about various corporations which she alleged were her past or present employers, despite the fact that she filed the articles of incorporation for one of these corporations and had the authority to sign checks for two of them.

to KRS 311.990(6). The Board did not "convict" Parrish of violating KRS 311.990(6). Instead, the Board found that her conduct in willfully impeding the investigation also fell within the grounds for discipline under KRS 311.595(9) and KRS 311.597 as dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud, or harm the public or any member.. Contrary to Parrish's assertion, the fact that a given act may be the basis of a criminal charge does not bar the Board from also disciplining a physician for that act. Indeed, many of the grounds for discipline in the Kentucky Medical Practices Act are expressly based on criminal conduct.[25]

■ Parrish also asserts that the Board violated her procedural due process rights because her hearing was "nominal." Parrish received both a temporary suspension hearing and a three-day final disciplinary hearing. She was represented by counsel at both hearings. She was permitted to and did call witnesses and to cross-examine opposing witnesses. In addition, the Board gave Parrish the opportunity to further supplement the record with additional deposition testimony after the three-day hearing. The record reveals that Parrish's hearing was not merely token; it was more than adequate to protect her procedural due process rights.

■ Parrish also asserts as grounds for appeal that the Board violated its own disciplinary procedure[26] by disciplining her for violating standards which were improperly adopted. Parrish asserts that the Board adopted the American College of Radiology (ACR) Standard for Performance of an Adult Barium Enema,[27] which Smith offered into exhibit at the disciplinary hearing, thus improperly promulgating administrative standards in violation of KRS 13A.120(6) and KRS 13A.130. However, the Board did not adopt these standards; it merely took notice of them when they were proffered by Smith. At the temporary hearing, Parrish claimed that the difference between her approach to fluoroscopy and Smith's approach was simply a matter of personal preference and that both met the standard of care. At the hearing, Smith simply offered the ACR standard as further support for his expert opinion that Parrish's failure to consistently do fluoroscopy in conjunction with barium studies was a violation of the standard of care in Kentucky and, indeed, the entire United States. As an expert witness, Smith was entitled to base his testimony, in part, on this standard because it is of the type reasonably relied upon by experts in his field of radiology in forming opinions about the standard of care.[28] The Board's consideration of these standards was permissible, especially given the liberal rules regarding evidence before the Board.[29] Moreover, the Board did not find that Parrish was subject to discipline for violating the ACR standard for barium enemas but rather for violating the standard of care in Kentucky. The ACR standard was merely one small piece of evidence used to establish that standard of care.

■ Parrish asserts that the hearing officer employed an "improper burden of proof" in his findings of fact, which

---

25. *See, e.g.,* KRS 311.595(3)-(5) and (15).

26. *See* KRS 311.555.

27. Marked in the administrative record as Deposition Exhibits 3 and 3A.

28. Ky. Rules Evid. 703.

29. "The Board is not required to follow strict procedures and rules in evidence in gathering evidence needed to help it reach a decision." *Kentucky State Bd. of Med. Licensure v. Ghali,* Ky.App., 721 S.W.2d 731, 733 (1986).

were subsequently adopted by the Board. She likewise asserts that the circuit court employed an "improper burden of proof" on review. Parrish's hearings were conducted in 1993, and her license was finally revoked in 1994. Parrish states, "[a]t that time, the prevailing burden of proof was a preponderance of the evidence and not some evidence." Parrish conflates the standard of proof at the administrative level and the standard of review at the circuit court level. Moreover, the record shows that the appropriate standard of proof and standard of review were applied. Parrish notes that the findings of fact and conclusions of law state that "the burden [of proof] is upon the Board to prove the charges made against the physician in the Board's complaint" but do not expressly state the standard of proof necessary. Parrish presumes that the hearing officer used some lesser standard of proof than preponderance of the evidence. *Black's Law Dictionary*[30] states, in relevant part, that the "preponderance of evidence," "[a]s standard of proof in civil cases, is evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it[.]" The findings of fact and conclusions of law are replete with examples in which the evidence in favor of Parrish and evidence against her are explicitly weighed, with the former found to be less convincing than the latter. For example, Finding of Fact Number 27 states as follows: "Dr. Parrish's testimony is not credible on the proper use or medical necessity of the fluoroscopy procedure. Dr. Smith's testimony is credible." In response to the

allegation that Parrish willfully refused to provide the Board's investigator any information about her corporate employers, the hearing officer found Parrish's claims of ignorance about the requested information to be "completely incredible." [31] Similarly, the hearing officer discounted the testimony of C. David Eversole, M.D., an expert witness called on Parrish's behalf, regarding the prevailing medical practice for radiologists in Kentucky, giving the testimony "little weight" [32] because of Eversole's unfamiliarity with Parrish's practice or the evidence at issue. Finally, the hearing officer noted that "Dr. Parrish's testimony at the hearing is given little weight because she simply was not a credible, truthful witness." [33] This indicates a careful, explicit weighing of the evidence which is the very essence of the preponderance of the evidence standard of proof. Thus, the hearing officer and Board applied the appropriate standard of proof. Parrish takes issue with the fact that the circuit court cited *Urella*,[34] a 1997 case, as expressing the appropriate standard of review for the Board's order of revocation. She focuses on the fact that the administrative action in question occurred in 1994, three years before *Urella* was rendered. However, *Urella* did not change the standard of review for an administrative decision; it merely reiterated it. Indeed, the *Urella* opinion cites two pre–1994 cases [35] as support for the "substantial evidence" standard of review for an administrative agency's findings of fact. Therefore, the circuit court applied the appropriate standard of review.

30. 1182 (6th ed.1990).

31. Finding of Fact No. 38.

32. Finding of Fact No. 40.

33. Finding of Fact No. 41.

34. 939 S.W.2d 869.

35. *Id.* at 873 (*citing Kosmos Cement Co., Inc. v. Haney*, Ky., 698 S.W.2d 819, 820 (1985) and *Kentucky State Racing Comm'n v. Fuller*, Ky., 481 S.W.2d 298 (1972)).

Parrish also challenges the Board's reliance upon the expert testimony of Smith. She acknowledges in her brief that Smith, a board-certified radiologist, is qualified on the basis of his education and training to be an expert witness. However, she argues that he went beyond the role of an expert witness to become an investigator or advocate. Parrish takes issue with the fact that Smith traveled to the hospitals where she practiced to examine the maintenance logs of the radiological equipment in response to her contention that some of it was dangerous or defective. While there, he also spoke to certain people who would also have knowledge of the equipment maintenance and Parrish's practice of radiology and obtained a copy of Parrish's billing code manual.

In effect, Parrish is complaining about the foundation or basis of Smith's expert testimony. However, as noted above, the law of Kentucky does not unduly restrict the evidence on which an expert witness bases his testimony. The expert is permitted to base testimony on facts supplied by third persons so long as it is the kind of information customarily relied on in his profession upon which his expertise is grounded.[36] Smith testified that these investigations were undertaken to try to get a complete picture of Parrish's practice of radiology. These inquiries, including the hearsay testimony of the other personnel, are within the scope of material upon which an expert witness may rely. Parrish also objects to the fact that Smith spoke to some people involved

in the radiology departments but not all of the people and, specifically, not to her. At most, this omission would go to the weight of his evidence. The relative weight and credibility of evidence are matters to be decided by the finder of fact, the Board.[37] Therefore, Parrish's claims concerning Smith's expert testimony provide no ground for appeal.

Parrish also asserts that the Board relied upon flawed evidence because it failed to compare her diagnoses made from the patients' x-rays and MRIs [38] with the "actual" diagnoses as ultimately confirmed by the patients' regular physicians but rather than with the diagnoses made by the Board's expert witnesses. However, Parrish has offered no evidence to show that the information revealed by the patients' "actual" diagnoses would have been any more favorable to her. At most, this omission would simply go toward the weight of the experts' testimony. Moreover, Parrish's license revocation was based on more than a high statistical error rate in diagnoses. The Board found systemic problems in her practice of radiology in general. Parrish has failed to demonstrate that the failure of the Board to compare her diagnoses to the "actual" diagnoses compels a contrary result.

Parrish also asserts that the Board's order of revocation was contrary to the weight of the evidence. In support of this claim, she raises numerous objections concerning specific factual findings in the findings of fact which were subsequently adopted by the Board. Pursuant to

---

36. *Buckler v. Commonwealth,* Ky., 541 S.W.2d 935, 940 (1976).

37. *Mill Street Church of Christ v. Hogan,* Ky. App., 785 S.W.2d 263, 266 (1990).

38. Charles Lee, M.D., a radiologist and neurologist, testified as an expert witness on the Board's behalf concerning Parrish's practice involving MRI's. Lee noted that Parrish misread nine of fourteen MRI's and rendered diagnoses on nondiagnostic films. Lee stated that, in his expert opinion, neither Parrish's performance nor interpretation of MRI examinations conformed to the current accepted standard of care for the field of radiology and neuroradiology in Kentucky.

201 Kentucky Administrative Regulations [KAR] 9:081 § 10(9),[39] "[a]ll parties shall have the right to file exceptions to the hearing officer's findings, conclusions and recommendations ten (10) days prior to the date set for the hearing panel's final determination." Failure to properly raise an issue before an administrative body precludes a person from asserting that issue in an action for judicial review of the agency's action.[40] A person "cannot pursue one theory below and another on appellate review."[41] The Board claims that Parrish never filed exceptions to the hearing officer's Recommended Findings of Fact. No such document is included in the administrative record or among the appendices to Parrish's brief. We discovered a document in the circuit court record captioned, "Exceptions to Recommendations of the Hearing Officer for the KBML, Dated July 7, 1994," apparently attached as an appendix to a memorandum which Parrish filed in circuit court on June 22, 2001. The appendix bears no file stamp or date stamp of either the Board or the circuit court. The burden of ensuring that the record is complete for review is on Parrish as the appellant.[42] Based on the absence of a dated and file-stamped copy of Parrish's objections to the hearing officer's proposed findings of fact, we find that Parrish did not timely file such a document twenty days prior to the December 1994 final hearing. Therefore, we find that Parrish did not preserve for appellate review any objections based on the hearing officer's factual findings.

The remainder of Parrish's numerous points of appeal are either wholly without merit, incapable of review because Parrish did not raise them at the appropriate stage, or incapable of review because Parrish has not designated where in the voluminous record, which includes three days of hearing testimony on untranscribed videotapes, she preserved the issue for appeal.[43]

For the foregoing reasons, the opinion and order of the Jefferson Circuit Court upholding the Kentucky Board of Medical Licensure's order of revocation of the medical license of Cherlyn Parrish, M.D. is affirmed.

ALL CONCUR.

---

**39.** Notably, KAR 9:081 was last revised effective March 14, 1994, so the version that was in effect at the relevant time period in late 1994 is still in effect today.

**40.** *Personnel Bd. v. Heck,* Ky.App., 725 S.W.2d 13, 17 (1986).

**41.** 939 S.W.2d at 874.

**42.** *Fanelli v. Commonwealth,* Ky., 423 S.W.2d 255, 257–58 (1968).

**43.** We note that Parrish's brief came perilously close to being stricken pursuant to CR 76.12(8)(a) for its failure to comply with the provisions of CR 76.12(4)(c)(iv)-(v). We reiterate the sentiments of Kentucky's highest court: "Although the court may and shall overlook simple mistakes of caption or designation, ... it is not the judge's function to sift through a garbled pleading like a prospector panning for gold." *Massengale v. Lester,* 403 S.W.2d 697, 700 (1966). While we decline to impose the harsh sanction of striking Parrish's brief noting that she is a *pro se* appellant, we also decline to wade through more than three days of untranscribed videotape testimony seeking, possibly in vain, evidentiary support for her appeal. *Robbins v. Robbins,* Ky.App. 849 S.W.2d 571, 572 (1993).